**WILLIAMS, GRAFFEO & STERN, LLC**
Brian P. Graffeo, Esq. (Attorney ID #026882004)
Stephen D. Santini, Esq. (Attorney ID # 363972021)
Courthouse Plaza
60 Washington Street, Suite 204
Morristown, New Jersey 07960
(973) 200-6350
Attorneys for Plaintiff
*Zonnia Lee*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ZONNIA LEE,<br><br>        Plaintiff,<br><br>    vs.<br><br>ELECTRIFAI, LLC; WHITE OAK FINANCIAL, LLC; WHITE OAK GLOBAL ADVISORS, LLC; EDWARD SCOTT; DIANE CLARK; SAMIR AGARWAL; and LUMING WANG<br><br>        Defendants. | <u>CIVIL ACTION</u><br><br><br>**COMPLAINT AND JURY DEMAND** |

**COMPLAINT**

Plaintiff Zonnia Lee, by and through her attorneys Williams, Graffeo & Stern, LLC, complains of corporate Defendants ElectrifAi, LLC, White Oak Financial, LLC, and White Oak Global Advisors, LLC (collectively, "Corporate Defendants"); and individual defendants Edward Scott, Diane Clark, Samir Agarwal and Luming Wang (collectively, "Individual Defendants") as follows:

**PARTIES; JURISDICTION; VENUE**

1.      Plaintiff Zonnia Lee ("Plaintiff") is a Caucasian woman who currently resides in New Mexico.

2. ElectrifAi, LLC is a limited liability company formed under the laws of the state of Delaware and headquartered in the state of New Jersey.

3. Plaintiff was employed by ElectrifAi in an executive sales capacity from May 2022 to August 2022 (the "Employment"), during which time she (born in 1956) was sixty-six (66) years old.

4. Plaintiff had more than thirty (30) years of prior experience in the sales, marketing, and/or customer relations industries prior to her Employment with ElectrifAi, as well as additional experience in roles as a buyer and planning coordinator.

5. Plaintiff advised ElectrifAi on multiple occasions that she had a medical condition that made getting a Covid-19 vaccine unsafe and so as a result was unable to travel by plane during the term of her Employment with ElectrifAi.

6. Defendant Edward Scott ("ES") was the Chief Executive Officer at ElectrifAi and a member of its Executive Committee throughout the duration of Plaintiff's Employment and as such, upon information and belief, he was the highest-ranking executive in ElectrifAi and subject only to oversight from ElectrifAi's Board of Directors (the "Board").

7. Defendant Diane Clark ("DC") was General Counsel at ElectrifAi, and also served as its head of Human Resources ("HR") and a member of or advisor to its Executive Committee throughout the duration of Plaintiff's Employment.

8. Defendant Samir Agarwal ("SA") was the Executive Vice President and Head of Products and Alliances at ElectrifAi as well as a member of its Executive Committee throughout the duration of Plaintiff's Employment.

9. Defendant Luming Wang ("LW") was the Chief Technology Officer at ElectrifAi as well as a member of its Executive Committee throughout the duration of Plaintiff's Employment.

10. During the term of her Employment, Plaintiff was subject to the direction and control of her superiors in the Executive Committee, including ES, DC, LW, and SA.

11. Upon information and belief, Defendants White Oak Financial, LLC and White Oak Global Advisors, LLC (both entities referred to herein as "White Oak") are limited liability companies formed under the laws of Delaware who owned ElectrifAi, appointed several members to ElectrifAi's Board, and otherwise exerted control and/or oversight over ElectrifAi's operations throughout the duration of Plaintiff's Employment.

12. This Court has jurisdiction over Plaintiff's Title VII, ADA, and FMLA claims as those claims arise under federal law, as well as supplemental jurisdiction over Plaintiff's NJLAD, fraud, common law, and contract-related claims pursuant to 28 U.S.C. § 1367 because they relate closely to the aforementioned federal-law claims and arise from a common nucleus of operative fact such that all claims form part of the same case or controversy.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Corporate Defendants do business in Jersey City, New Jersey and some of the acts of discrimination and retaliation alleged occurred in New Jersey.

**NATURE OF ACTION; PRE-EMPLOYMENT; TERMS OF EMPLOYMENT**

14. This is an action to address the severe and pervasive harassment, hostile work environment, discrimination, retaliation, wrongful termination, and intentional infliction of emotional distress that Plaintiff was subject to during and after the term of her Employment at ElectrifAi, as well as ElectrifAi's otherwise fraudulent and bad faith practices.

15.     Around February 2022, while working in a sales capacity for her then-employer, Infor (a company that offers industry-specific enterprise software), Plaintiff made herself available to new employment opportunities elsewhere with a strong preference for jobs that would allow her to continue gaining experience selling "high-tech" products or services, like software, cloud computing, and/or artificial intelligence.

16.     Over the course of multiple weeks throughout February, March, and April 2022, Plaintiff corresponded by email and over the phone with several members of ElectrifAi's Executive Committee (primarily ES but also DC, SA, and LW; the "Pre-Employment Discussions") about her potential employment in an executive sales capacity at ElectrifAi.

17.     Throughout these Pre-Employment Discussions, Plaintiff was repeatedly advised that ElectrifAi's products were all "machine learning" or "artificial intelligence" ("ML/AI") and that her job would involve selling the same.

18.     In light of her aforementioned desire to continue working in a "high-tech" field, Plaintiff found the opportunity to work for a company selling ML/AI products highly appealing and made multiple inquiries for more specific information about the products she would be selling at ElectrifAi, including how these products worked and what precisely a client would be able to do if they purchased these products.

19.     Plaintiff was also transparent during her Pre-Employment Discussions about how her medical condition, which made it unsafe to receive a Covid-19 vaccine and thus unable to travel by plane.

20.     By April 9, 2022, ElectrifAi sent Plaintiff a written offer of employment (the "Offer Letter") to work as a Senior Account Manager at ElectrifAi. *See a true and accurate copy of the Offer Letter attached hereto as Exhibit A.*

21.     At the time Plaintiff received this offer of employment from ElectrifAi, she had not been provided with responsive answers to her inquiries for specific information about the ML/AI products that she would be selling.

22.     Plaintiff was instead provided only generic information about the ML/AI products she would be selling during the Pre-Employment Discussions, including reference to ElectrifAi's website.

23.     Plaintiff accepted ElectrifAi's offer and returned a signed Offer Letter several days later, around April 12, 2022, and would start working on May 2, 2022.

24.     In doing so, Plaintiff relied on the repeated and uncontradicted information about ML/AI products referenced by members of ElectrifAi's Executive Committee in the Pre-Employment Discussions and otherwise contained throughout what ElectrifAi did provide her in deciding that ElectrifAi was selling the type of "high-tech" products that she desired.

25.     Plaintiff also rejected several other job offers she had received for similar positions at reputable companies by accepting ElectrifAi's offer.

26.     As reflected in the Offer Letter, Plaintiff's employment at ElectrifAi entitled her to a sign-on bonus of $10,000, eligibility for ElectrifAi's performance-based "Commission Plan", eligibility in ElectrifAi's equity plan, and a base annual salary of $200,000, in addition to "medical, dental, short-term disability coverage and other employee benefits" generally offered by ElectrifAi. *See Exhibit A*.

27.     Plaintiff received a copy of ElectrifAi's Code of Conduct shortly after accepting employment and returned a signed copy on April 19, 2022. *See a true and accurate copy of the Code of Conduct attached hereto as Exhibit B*.

28.     ElectrifAi's Code of Conduct explicitly prohibits several forms of conduct, including:

> "[A]ny act of physical or sexual assault, or <u>any threatening, intimidating or harassing behavior against others,</u> which relates in any way to employment with the Company";

> "[F]ighting or causing personal injury, or property damage, and other forms of disorderly conduct, including <u>abusive or threatening language</u>";

> "[O]bscene or abusive language toward any manager, employee, or client";

> "[S]ending or posting <u>discriminatory, harassing, or threatening messages</u> or images"; and

> "[R]etaliatory harassment, intimidation, threats, coercion, discrimination, or adverse employment decisions – taken because an employee has filed a complaint".
> *See Exhibit B, pages 11, 18, and 27* (emphasis added).

29.     ElectrifAi's Code of Conduct also explicitly provides that "individuals who believe they have been the victim of sexual or other unlawful harassment or discrimination, or believe they have witnessed sexual or other unlawful harassment or discrimination, should report their concerns to [HR], the Legal Department or any supervisor". *See Exhibit B, pages 27-28*.

30.     Further, the Code of Conduct provides that ElectrifAi would "perform a prompt, fair, and expeditious investigation", would maintain confidentiality to the extent practicable and consistent with conducting an investigation, and that employees who complained of harassment or discrimination would be protected against retaliation. *See Exhibit B, page 30.*

31.     In between the time when Plaintiff accepted ElectrifAi's offer and the first week of her Employment, for reasons unbeknownst to Plaintiff, much of the sales staff that she was set to work alongside had their employment terminated.

32.     As a result, by the time that Plaintiff did start working at ElectrifAi, there were very few non-executive staff that had been at the company for more than a few months.

## PLAINTIFF'S EMPLOYMENT

### A. <u>Facts Common to All Counts</u>

33.     Plaintiff's Employment at ElectrifAi was unusual in several respects which left her particularly vulnerable to the hostile work environment there and illustrates a fraud or other bad faith act was being perpetuated upon Plaintiff when she was induced into joining ElectrifAi with promises of selling ML/AI products.

<u>Superficial Titles.</u>

34.     While the Offer Letter (*see Exhibit A*) of April 9, 2022 reflected that Plaintiff was originally hired to the position of "Senior Account Manager", when  she started work on May 2nd she was advised that her title was changed to "Senior Director of Business Development".

35.     By May 19, 2022, Plaintiff's title was changed again to "Senior Vice President of Global Sales and Strategy".

36.     Plaintiff was advised by ES that her title was changed again to a third "position" in less than three (3) weeks of working at ElectrifAi because her former title(s) did not have enough "push" behind them to be of use while contacting clients.

37.     Plaintiff's job was otherwise identical in all material respects, however, including pay/benefits, daily responsibilities, Plaintiff's superiors, and the other staff she worked with.

38.     Plaintiff's daily responsibilities in all three "positions" initially revolved primarily around selling renewals, upgrades, and additional products to pre-existing "sales accounts" that she was assigned by the Executive Committee, while also occasionally contacting prospective new clients in an effort to make new sales.

39. As such, it was immediately clear that Plaintiff's "positions" at ElectrifAi were superficial constructions meant to bolster her legitimacy and stature in what was otherwise a single executive sales role.

Dysfunctional/Fraudulent Products for Sale.

40. Plaintiff's efforts to make new sales at ElectrifAi were significantly hindered from the start because, despite her continued attempts to obtain specific information about how ElectrifAi's products worked, Plaintiff's superiors in the Executive Committee and other coworkers refused or were unable to provide this information.

41. As such, Plaintiff was tasked with selling technically advanced ML/AI products but was forced to rely on generic information in doing so and could not demonstrate the effectiveness of ElectrifAi's products or provide information about specific functions.

42. Plaintiff came to find out from experience and conversations with other members of the sales team that they were all struggling to make any sales at any point in Plaintiff's Employment because whenever the team reported a prospective client indicated they were interested in ElectrifAi's products, the Executive Committee would take the lead away from the sales team and advise that the sales team "did not have the finesse" to close a deal.

43. The deals that the Executive Committee took away rarely, if ever, were closed.

44. As such, it was always unclear to Plaintiff when the currently existing "accounts" she was provided with were obtained by ElectrifAi, who at the company obtained these clients, and how they went about making these sales.

45. Plaintiff was also refused information about ElectrifAi's prior sales at every point and after multiple requests of multiple members of the Executive Committee.

46. On one occasion, ES sent a large group email advising that Plaintiff was temporarily considered "Interim Head of Sales" and she was subsequently asked to create a sales projection for the sales team to hit by year end.

47. In response to this request, Plaintiff asked multiple members of the Executive Committee for information about ElectrifAi's sales the prior year or the prior quarter or information about how much ElectrifAi's clients spent on average.

48. However, in spite of the fact that it would be a dubious exercise to ask Plaintiff to create a sales projection without any information about the average profit for sale or prior sales figures, Plaintiff was not provided with any answers to her questions and the Executive Committee was either unwilling or unable to provide this information.

49. Later into Plaintiff's Employment, she became advised by client-facing staff that several of ElectrifAi's ML/AI products were not working properly, including a "Vendor Compression" product that was supposed to scrape the internet for different nomenclatures using ML/AI.

50. Plaintiff was subsequently advised by an ElectrifAi employee that the ML/AI products being sold by ElectrifAi were not actually operated by machine learning or artificial intelligence but rather by manual labor, and that ElectrifAi could not afford to staff these products sufficiently, resulting in several products losing functionality.

51. Plaintiff also spoke to a different ElectrifAi employee who advised that what ElectrifAi was selling to its clients included "services", like manual mass emailing, as opposed to a "product", like one using ML/AI.

52.     This apparent admission that ElectrifAi was selling manually operated "services" as opposed to ML/AI "products" was particularly unexpected because Plaintiff (as a sales executive) had never been advised ElectrifAi sold any "services" at all.

53.     As such, it appeared that the ML/AI "products" that induced Plaintiff into working at ElectrifAi and that she would have needed to sell to be eligible for commission pay were not in fact "machine learning" or "artificial intelligence", were not in fact "products" in many cases (insofar as they were actually manually operated "services"), and further, were not functional.

Disregarded Advice.

54.     In spite of Plaintiff's prior experience in the sales industry which had been praised by ElectrifAi's Executive Committee initially, Plaintiff came to find that advice she offered was never implemented and did not seem to be given serious or equal consideration at ElectrifAi in spite of its obvious merits.

55.     Plaintiff strongly insisted from the start of her employment that ElectrifAi revert to using standardized systems for data storage, communications, and customer relationship management ("CRM") as opposed to the multiple systems that had been used previously.[1]

56.     Plaintiff noted that using standardized systems would undoubtedly increase ElectrifAi's efficiency, make staff feel more connected, and would be of great use in particular to salespersons because they would be able to access data about other sales made within the company.

57.     Sales staff did not have access to data about other sales made within the company previously and, as such, often wasted time preparing for and contacting prospective that had already been contacted by another member of ElectrifAi's team.

---

[1] ElectrifAi's staff had been using several different applications to store data, including Salesforce, Box, Microsoft Excel and Word, and multiple others, including WhatsApp, email, Microsoft Teams, and Zoom, to communicate internally.

58.    Occasionally, because the sales staff were otherwise completely unaware of other accounts belonging to ElectrifAi, they would end up contacting existing clients while attempting to make a new sale.

59.    Accordingly, Plaintiff was given authority to hire a Salesforce Administrator to design a customized CRM system that had been agreed upon between Plaintiff and SA and that would be used by all of ElectrifAi.

60.    Plaintiff spent countless hours with ElectrifAi's Salesforce Administrator designing a customized CRM system, and they eventually finished the CRM project to their satisfaction.

61.    However, despite the extensive time Plaintiff spent designing this custom CRM (at the expense of working on other tasks like attempting to make new sales), Plaintiff later came to find that SA went in after the fact and reverted all of their customized changes back so that Salesforce operated the same way it did before the project started.

62.    Plaintiff asked multiple times for an explanation about what had changed to make ElectrifAi suddenly reverse course, in spite of the significant time and resources had already been invested, but she was never given a substantive explanation and was eventually advised to stop asking about this issue.

63.    On another occasion, Plaintiff observed that ElectrifAi was employing multiple assistants who were obviously unproductive insofar as they rarely showed up for work or work meetings and often could not communicate effectively in English.

64.    Plaintiff also observed that these assistants were not contributing as much as other staff.

65.    Plaintiff advised the Executive Committee that these assistants should have been replaced and/or reduced in number to improve ElectrifAi's efficiency.

66.     However, yet again, Plaintiff's advice was not heeded, and she was not given any explanation for why the company insisted on retaining multiple staff that were not making meaningful contributions.

67.     On another occasion, ElectrifAi decided to attend a corporate networking event (ProcureCon) at Plaintiff's suggestion, one of the rare instances where her advice actually appeared to be taken into consideration.

68.     Plaintiff's general sales expertise and experience, specific knowledge of ProcureCon, and the fact that her suggestion prompted ElectrifAi to make an appearance at this convention all suggested (in addition to her title as Senior Vice President of Global Sales and Strategy) that Plaintiff should have been one of the most involved staff preparing for this event.

69.     However, inexplicably, Plaintiff was excluded from all communications, planning and strategizing related thereto.

70.     Plaintiff later came to determine that a series of group emails were exchanged with a "team" that had been created to prepare for this event that ES himself would be making an appearance at.

71.     Instead of invoking Plaintiff's assistance, ES opted to hire another member of the sales team to predominantly handle ElectrifAi's in-person events.

72.     There was no apparent meritorious explanation for why Plaintiff was excluded from any role in planning ElectrifAi's appearance at an event that they were only attending at her suggestion.

Contradictory Instructions.

73.     The entire ElectrifAi sales team, including Plaintiff, were provided several sets of contradictory instructions which restricted and/or impeded their ability to perform their jobs properly and left them constantly guessing what ElectrifAi's executives expected of them.

74.     From the start of Plaintiff's Employment, she was advised that she was expected to make efforts to contact potential new clients to sell ElectrifAi's products and was never told not to contact prospective clients or that permission was needed before doing so.

75.     Regardless of whether she was reaching out to prospective new clients or pre-existing accounts, Plaintiff emphasized the "quality" of her interactions as opposed to the "quantity" and spent significant time and effort researching each potential "lead" or client.

76.     Plaintiff's efforts to emphasize "quality" interactions over "quantity" was in conformity with her prior experience and with sales strategies Plaintiff discussed with ElectrifAi's Executive Committee during her Pre-Employment Discussions.

77.     One day during Plaintiff's Employment, ES was particularly annoyed that the sales team lost the interest of a prospective client and screamed at Plaintiff to "handle" the account.

78.     Plaintiff responded to ES's instructions by contacting the head of that prospective client's company and setting up a meeting to pitch ElectrifAi's products.

79.     When Plaintiff informed ES of this prospective meeting, however, he began to scream and claim that she "had no right to call that company", "had no finesse", and that only he could make such a call.

80.     Immediately thereafter, ES enacted a rule/policy that before any member of the sales team could call another company, an email or call was to be sent to the Executive Committee requesting background information and permission to call that company.[2]

---

[2] As this policy required permission before making "sales calls", it could be very limiting if a licensed executive was not able to approve of these requests or was in disagreement about taking a new client.

81.     Plaintiff pushed backed on this new policy because of the obvious inefficiency involved with seeking permission before every interaction but was ordered by ES to abide and threatened that "the only reason [she] eat[s] is because of him".

82.     Towards the end of Plaintiff's employment and in almost direct contradiction to the prior policy requiring Executive Committee approval before contacting clients, SA took all of Plaintiff's accounts away from her and assigned them to another individual (his male friend) in sales while instructing Plaintiff that she was then to start spending her days focusing solely on making as many cold calls as possible to potential clients, at the expense of spending any time researching or otherwise preparing for these interactions.

83.     Plaintiff was yet again refused any explanation for this precarious decision and was ordered to obey.

84.     Within a brief period of time, as elaborated further below (*see Section C*), Plaintiff was then advised by ES himself of the need to spend more time focusing on each prospective client.

85.     As shown by the email sent by ES to members of the Executive Committee and other staff on August 22, 2022, ES derided SA's decision to have the sales team focus solely on making cold calls. *See a true and accurate copy of the email chain which includes the aforementioned email sent by ES on August 22, 2022, attached herewith as Exhibit C.*

86.     As shown above, Plaintiff was subject to several circumstances at ElectrifAi that impeded her ability to perform her job.

87.     Specifically, Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, was constantly refused specific information about the products she was selling, was tasked with selling apparently nonfunctional or suboptimized products, never

had her advice implemented or seriously considered, was excluded from projects that she was more qualified to assist with than others assigned thereto, and was otherwise given contradictory, fluctuating and/or restrictive instructions, like the policy requiring Executive Committee approval before contacting any prospective client.

88.    The above is evidence of a fraud being perpetuated by ElectrifAi and its other bad faith conduct in inducing Plaintiff's employment to sell ML/AI products while simultaneously restricting her ability to sell said products (and thus restricting her eligibility to receive an additional commission), but also a part of the pretext for the harassment and the hostile work environment that Plaintiff was eventually subject to.

**B. Facts Common to All Discrimination-Related and Intentional Infliction of Emotional Distress Claims**

89.    Soon after Plaintiff began working at ElectrifAi, she immediately observed that the work environment was incredibly hostile in that she was subject to rampant discriminatory, offensive, threatening language being used by executives, and certain individuals (especially the Executive Committee) were immune to criticism while many others were subject to constant and disproportionate ridicule.

90.    Throughout Plaintiff's Employment, she and many other members of ElectrifAi's sales team engaged in daily videoconference or telephone meetings that ES was in charge of as well as smaller, less inclusive internal calls with ES and other members of the Executive Committee like DC, SA, and LW.

91.    During these meetings, both big and small, ES regularly made comments that were discriminatory on their face and/or which otherwise reflected an obvious disdain for people of certain races, sexes, disabilities and ages, including some that were heavily represented within ElectrifAi's staff.

92.     In one meeting, when talking with a potential client who was the CEO of his company, ES interrupted this individual mid-sentence to ask, "Are you Iranian?", without any prior mention of race or ethnicity to give this comment context.

93.     This comment reflected one of many instances where ES exhibited a general and unusual fixation with race, and one of many instances that made Plaintiff feel very uncomfortable.

94.     Plaintiff observed many other instances where ES' comments reflected a disdain for or other unusual fixation on certain races, genders, disabilities and/or ages, in addition to the general antagonism he acted out towards everybody.

95.     As such, Plaintiff perceived that the work environment at ElectrifAi was hostile to staff based on certain characteristics that were meant to be protected

96.     Plaintiff's observation of ES's irrational obsession and disrespect for certain minorities also suggested that comments that appeared neutral on their face were likely to be premised on some protected characteristic.

97.     For instance, on one occasion, ES admonished Plaintiff in front of a large group of ElectrifAi employees as being "too stupid to understand" something he mentioned.

98.     In light of the fact that Plaintiff was in fact more experienced than many others at ElectrifAi, and more knowledgeable, this comment not only appeared to be false, but also (in light of ES's prior conduct) an invocation that Plaintiff was "too stupid" because of some protected characteristic.

99.     ES also regularly and publicly screamed at certain members of ElectrifAi's sales team, for example, often getting so loud and angry that he was unable to form coherent words.

100. However, Plaintiff observed that ElectrifAi's some other staff were immune to ES's criticism, screaming, and threatening instructions, in spite of the fact that could not fathom what meaningful function they provided for ElectrifAi's team.

101. Additionally, instructions were regularly given in an overly aggressive and threatening manner by ES and other members of the Executive Committee, with Plaintiff frequently being told to "stop asking questions", being yelled at to perform simple tasks that she was otherwise willing to do, and otherwise being threatened with the loss of her employment, especially when, in good faith, Plaintiff presented reasons to doubt the efficacy of what ElectrifAi's staff were being told to do.

102. This conduct of ElectrifAi's Executive Committee was not only extreme and outrageous, but also contrary to what Plaintiff's lengthy prior experience in the industry reflected would ever be appropriate.

103. Plaintiff had never previously worked in an environment so hostile to genuine attempts to provide helpful suggestions, so frequently littered with discriminatory, insensitive, and inappropriate comments, or so dysfunctional for the other reasons set forth above.

104. All of the above, and in particular the language and conduct of members ElectrifAi's Executive Committee, made Plaintiff feel significant emotional distress during and continuing after her Employment as result.

105. Plaintiff is not aware of any actions taken by other members of the Executive Committee or ElectrifAi's Board of Directors to remedy ES's harsh and targeted conduct, including any discipline that ES was ever subject to or any suggestion that he should treat the staff more respectfully, and it was also significantly distressful to Plaintiff knowing that the aforementioned conduct appeared supported by ElectrifAi's executives.

106.    ES's conduct and language clearly made other staff feel uncomfortable and led to a general "chilling effect" in meetings, as evidenced by conversations that Plaintiff had with other staff and Plaintiff's observation that several members of ElectrifAi's sales team who were supposedly "required" to be present for the aforementioned daily meetings started refusing to attend these meetings or attending these meetings but with their attention focused elsewhere.

## PLAINTIFF'S TERMINATION

107.    All of the above culminated in an email sent by ES to SA, DC, and other staff/members of the Executive Committee on August 22, 2022 where ES stated, after deriding the decision to have sales staff focus solely on making cold calls, that ElectrifAi's Executive Committee "need visibility [in]to Ms. Lee ASAP" and "Rahul will manage and handle her <u>one way or the other</u>." *See Exhibit C* (emphasis added).

108.    Plaintiff immediately objected to ES's email and the accusations that she was untrained (Plaintiff was obviously and undisputedly very experienced) and operating without visibility from leadership (as referenced above, Plaintiff had just been required to seek Executive Committee approval before contacting any prospective client). *See Plaintiff's email response contained in Exhibit C*.

109.    Plaintiff remained uncomfortable, however, because of ES's past discriminatory and inappropriate language, threats, the preferential treatment staff other than Plaintiff appeared to be receiving, and the myriad of impediments to the staff's ability to perform their job well that were in some way the result of the Executive Committee's acts and decisions (*see Subsection A above*), as well as the sentiment contained at the end of this email chain that Plaintiff would be "managed" or "handled" in "one way or the other".

110.    Plaintiff also held the belief, for the aforementioned reasons and in light of the aforementioned context, that ES's email was one of many instances of harassment being perpetrated by the Executive Committee.

111.    In light of the fact that ES's prior language and conduct, and the fact ES's email appeared otherwise factually incorrect (insofar as Plaintiff was actually very experienced and the Executive Committee had frequent oversight over her work), this email of August 22nd also came off as being directed at Plaintiff because of some protected characteristic.

112.    Plaintiff subsequently scheduled a meeting with HR representative Juliana Rosario to discuss the contents of this email (the "HR Meeting"), which meeting was held on August 25, 2022.

113.    While Plaintiff was concerned that her discussion with Ms. Rosario would not be effective at remedying her complained of behavior and could aggravate things further, because DC was Ms. Rosario's HR supervisor, Plaintiff was repeatedly assured that the contents of her HR Meeting would be strictly confidential.

114.    During the HR Meeting, Plaintiff discussed ES's comment, how it made her feel uncomfortable, and how she believed his conduct constituted harassment.

115.    After Plaintiff's HR Meeting Ms. Rosario assured Plaintiff that HR would explore the actions of [ES] and address them accordingly.

116.    Approximately three (3) hours after this HR meeting, that same day, Plaintiff's employment was terminated (the "Termination").

117.    Plaintiff asked for an explanation as to why she was terminated and was advised only that her "position" had been "eliminated".

118.    Plaintiff was not advised that her Termination had anything to do with her performance or her contributions to ElectrifAi's team, however, and the proximity in time of her Termination to the HR Meeting suggested strongly that Plaintiff's comments made therein were the real reason her employment was terminated.

119.    Plaintiff had no knowledge that her work was not in keeping with what she was hired for, and she was never given any performance improvement plan ("PIP").

120.    Additionally, Plaintiff's changing titles and the fact that she was advised her latest title was crafted to add legitimacy during client interactions suggested that Plaintiff's Termination was not actually the result of her "position" being "eliminated".

## POST-TERMINATION

121.    Even after her Termination, Plaintiff has been suffering as a result of her prior Employment with ElectrifAi.

122.    Upon information and belief, many of Plaintiff's prospective new employers would have contacted Plaintiff's supervisors at ElectrifAi, as her most recent former employer, to inquire about her qualifications and/or an explanation for her abrupt tenure there.

123.    Upon information and belief, ElectrifAi has been attempting to ruin Plaintiff's reputation using false or misleading statements which mischaracterize her tenure at ElectrifAi and/or her qualifications to continue working in an executive sales capacity for other companies.

124.    This is apparent because, while Plaintiff has made numerous efforts to seek employment after her Termination from ElectrifAi, had been highly desirable in the industry prior to her tenure at ElectrifAi, and was otherwise objectively very qualified, all of Plaintiff's efforts to obtain new employment for almost an entire year since Termination were unsuccessful, so much

so that Plaintiff was not even receiving callbacks or offered even a single interview, including for positions offering to pay less than half of what Plaintiff made at ElectrifAi.

125.    Upon information and belief, ElectrifAi also reported false, misleading, or otherwise erroneous information to various federal or state agencies, depriving Plaintiff of the ability to collect unemployment and insurance.

126.    Additionally, Plaintiff was never provided with a hard copy W2 by ElectrifAi until very recently, after repeated requests by counsel.

127.    For all of the foregoing reasons, Plaintiff's Employment at ElectrifAi was very stressful and her post-Employment remained so because inexplicably, and in spite of her ample experience, Plaintiff suddenly found herself unable to find another job, even one paying slightly less than what she was making at ElectrifAi.

128.    Plaintiff had incurred certain financial obligations (such as car payments) based on the salary that she was set to make at ElectrifAi, and in the wake of her continued unemployment, these financial obligations added to Plaintiff's stress significantly.

129.    Plaintiff was required to visit the emergency room in February 2023 for an irregular heartbeat that, for all of the foregoing reasons, was obviously related to the stress Plaintiff experienced while working at ElectrifAi and immediately after her Termination.

130.    Plaintiff did not have any pre-existing conditions or prior medical history of heart-related issues but was advised that the symptoms she exhibited could have led (and may lead in the future) to a stroke.

**COUNT ONE**
**TITLE VII RETALIATION**
**(ALL DEFENDANTS)**

131.    Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

132.     Plaintiff met with ElectrifAi's HR department on August 25, 2022 to discuss her concerns about the conduct of ElectrifAi's Executive Committee, which she reasonably believed constituted improper harassment, threatening behavior, or other discriminatory acts.

133.     This reasonable belief was not only based on the content of this email itself, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

134.     Plaintiff's decision to meet with the HR department to report a believed incident of harassment, threats, and/or discriminatory behavior was a protected activity not only by applicable statutes, but also by the terms of ElectrifAi's own Code of Conduct, and was known to her employer.

135.     Nevertheless, ElectrifAi took materially adverse employment actions against Plaintiff, terminating her employment and subsequently stifling her attempts to collect unemployment, Medicare benefits, and/or to obtain subsequent employment.

136.     Plaintiff's protected activity, which occurred mere hours before her Termination, was causally connected therewith.

137.     The Corporate Defendants are liable under Title VII as Plaintiff's employer.

138.    The Individual Defendants are liable under Title VII as aiders and abettors of Plaintiff's retaliation.

139.    All Defendants actively participated in and/or acted with willful indifference to Plaintiff's statutorily protected rights.

140.    As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

141.    Plaintiff is also entitled to punitive damages and other remedies as appropriate under Title VII.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

### COUNT TWO
### NJLAD RETALIATION
### (ALL DEFENDANTS)

142.    Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

143.    Plaintiff met with ElectrifAi's HR department on August 25, 2022 to discuss her concerns about the conduct of ElectrifAi's Executive Committee, which she reasonably believed constituted improper harassment, threatening behavior, or other discriminatory acts.

144.    This reasonable belief was not only based on the content of this email itself, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was

selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

145. Plaintiff's decision to meet with the HR department to report a believed incident of harassment, threats, and/or discriminatory behavior was a protected activity not only by applicable statutes, but also by the terms of ElectrifAi's own Code of Conduct, and was known to her employer.

146. Nevertheless, ElectrifAi took materially adverse employment actions against Plaintiff, terminating her employment and subsequently stifling her attempts to collect unemployment, Medicare benefits, and/or to obtain subsequent employment.

147. Plaintiff's protected activity, which occurred mere hours before her Termination, was causally connected therewith.

148. The Corporate Defendants are liable under the New Jersey Law Against Discrimination ("NJLAD") as Plaintiff's employer.

149. The Individual Defendants are liable under NJLAD as aiders and abettors of Plaintiff's retaliation.

150. All Defendants actively participated in and/or acted with willful indifference to Plaintiff's statutorily protected rights.

151. As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

152. Plaintiff is also entitled to punitive damages and other remedies as appropriate under NJLAD.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

**COUNT THREE**
**RETALIATION**
**(ALL DEFENDANTS)**

153. Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

154. In *Pierce v. Ortho Pharm. Corp.*, the New Jersey Supreme Court set forth a common law action for wrongful retaliation that is applicable where an employee is discharged for reasons "contrary to a clear mandate of public policy". 84 N.J. 58, 417 A.2d 505 (1980).

155. Plaintiff was discharged from ElectrifAi because of her: Refusal to participate in what she reasonably believed to be a discriminatory and hostile work environment created and fostered by ES and other members of the Executive Committee; refusal to participate in what she reasonably believed to be ElectrifAi's scheme to sell fraudulent ML/AI products that were not actually operated on "machine learning" or "artificial intelligence", and/or the possibility that she could otherwise expose ElectrifAi's fraud; and/or Plaintiff's decision to exercise the option provided by ElectrifAi's own Code of Conduct to report believed violations of law or public policy to the human resources department concerning ES's conduct.

156. Plaintiff's reasonable belief was not only based on the content of the August 22, 2022 email itself, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times

within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

157.    Plaintiff's discharge on these grounds, in light of the aforementioned context, violates clear mandates of public policy.

158.    The Corporate Defendants are liable as Plaintiff's employer.

159.    The Individual Defendants are liable as aiders and abettors of Plaintiff's retaliation.

160.    All Defendants actively participated in and/or acted with willful indifference to Plaintiff's protected rights.

161.    As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

162.    Plaintiff is also entitled to punitive damages and other remedies as appropriate.

163.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

## COUNT FOUR
## CEPA VIOLATIONS
## (ALL DEFENDANTS)

164.    Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

165.    Plaintiff undertook the protected activity of meeting with HR to discuss the email of August 22, 2022 that was sent by ES and that she reasonably believed constituted improper harassment, threatening behavior, or other discriminatory conduct in violation of relevant laws, rule, regulations, and public policies related thereto.

166.    This reasonable belief was not only based on the content of this email itself, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

167.    Plaintiff's attempts to report reasonable concerns of harassment, threats, and/or discrimination was a protected "whistle-blowing" activity under the Conscientious Employee Protection Act ("CEPA").

168.    Plaintiff was subject to adverse employment action, including the termination of her employment at ElectrifAi, by Defendants subsequent to her engaging in this protected activity.

169. The adverse employment action Plaintiff was subject to was causally connected with her protected activity, which occurred mere hours before her Termination.

170. The Corporate Defendants are liable under CEPA as Plaintiff's employer.

171. The Individual Defendants are liable under CEPA as aiders and abettors of retaliation against Plaintiff.

172. As a result of Defendants' retaliatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

173. Plaintiff is also entitled to punitive damages and other remedies as appropriate under CEPA.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

**COUNT FIVE**
**TITLE VII HOSTILE WORK ENVIRONMENT**
**(ALL DEFENDANTS)**

174. Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

175. Plaintiff was repeatedly subject to and witness of offensive and discriminatory language, public lambasting and verbal abuse, and other threats to her livelihood while employed at ElectrifAi that made the work environment objectively and subjectively offensive.

176. The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed would not have occurred but for her race, gender, disability, or age, or that of her co-employees.

177.     This belief was not only based on the content of ES's recent email, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

178.     The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed, when considered in the context of the aforementioned circumstances, amounted to more than mere "rudeness" or "insensitivity" and was severe and/or pervasive enough to make a reasonable person of the same race, gender, disability, age, and/or other like characteristic believe that the conditions of employment were altered.

179.     Defendants ES and SA are liable as the individuals who made these harassing and/or threatening comments to Plaintiff.

180.     The Corporate Defendants are liable as Plaintiff's employer who allowed said conduct to transpire.

181.     Defendants DC and LW are liable as aiders and/or abettors to the harassing comments made to Plaintiff by other members of the Executive Committee.

182.     As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

183.     Plaintiff is also entitled to punitive damages and other remedies as appropriate under Title VII.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

## COUNT SIX
## NJLAD HOSTILE WORK ENVIRONMENT
## (ALL DEFENDANTS)

184.     Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

185.     Plaintiff was repeatedly subject to and witness of offensive and discriminatory language, public lambasting and verbal abuse, and other threats to her livelihood while employed at ElectrifAi that made the work environment objectively and subjectively offensive.

186.     The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed would not have occurred but for her race, gender, disability, age, or other protected characteristic or that of her co-employees.

187.     The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed, when considered in the context of the aforementioned circumstances, amounted to more than mere "rudeness" or "insensitivity" and was severe and/or pervasive enough to make a reasonable person of the same race, gender, disability, age, and/or other like characteristic believe that the conditions of employment were altered.

188.     This reasonable belief would not only based on the content of ES's recent email itself, but also ES's history of discriminatory and inappropriate language and threatening behavior as well the facts that (A) Plaintiff had her "position" changed three (3) times within her first three

(3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested that Plaintiff was never given a fair opportunity to contribute to the best of her ability.

189.     Defendants ES and SA are liable as the individuals who made these harassing comments to Plaintiff.

190.     The Corporate Defendants are liable as Plaintiff's employer who allowed said conduct to transpire.

191.     Defendants DC and LW are liable as aiders and/or abettors to the harassing comments made to Plaintiff by other members of the Executive Committee.

192.     As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

193.     Plaintiff is also entitled to punitive damages and other remedies as appropriate under NJLAD.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

## COUNT SEVEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (ALL DEFENDANTS)

194.     Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

195.     Plaintiff was repeatedly subject to and witness of offensive and discriminatory language, public lambasting and verbal abuse, and other threats to her livelihood while employed at ElectrifAi that were made intentionally by the individuals purveying this language.

196.     The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed was so extreme and outrageous as to go beyond all possible bounds of decency and be considered atrocious and utterly intolerable in a civilized community.

197.     Among other things, the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions all reflect on the extreme and outrageous nature of the conduct that Plaintiff was subject to.

198.     The offensive language, verbal derision, and other threats Plaintiff was subject to or witnessed caused Plaintiff significant emotional and mental distress, and has led to ongoing issues, including Plaintiff's post-Termination treatment for an irregular heartbeat.

199.    The emotional / mental distress Plaintiff was required to endure at ElectrifAi was so severe that no reasonable person could be expected to endure it.

200.    Defendants ES and SA are liable as the individuals who made harassing and threatening comments to Plaintiff.

201.    The Corporate Defendants are liable as Plaintiff's employer who allowed said conduct to transpire.

202.    Defendants DC and LW are liable as aiders and/or abettors to the harassing comments made to Plaintiff by other members of the Executive Committee.

203.    As a result of Defendants' discriminatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

204.    Plaintiff is also entitled to punitive damages and other remedies as appropriate.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

## COUNT EIGHT
## FRAUDULENT MISREPRESENTATION
## (ALL DEFENDANTS)

205.    Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

206.    ElectrifAi, and several members of its Executive Committee, including the Individual Defendants, made numerous representations to Plaintiff and others in Plaintiff's presence that ElectrifAi was selling "artificial intelligence" or "machine learning" products and that these products were otherwise functional.

207.    ElectrifAi's representations regarding the ML/AI products Plaintiff would supposedly be selling were material to her decision to work there.

208.    ElectrifAi and the Executive Committee members who made these representations to Plaintiff did so knowing that these supposedly "artificial intelligence" or "machine learning" products were actually operated by manual labor, and as such, were not actually operating on "artificial intelligence" or "machine learning" and in light of a lack of staffing, were not functional.

209.    Plaintiff was advised by multiple staff at ElectrifAi after her Employment commenced that ElectrifAi's products were manually operated and dysfunctional due to a lack of manpower support.

210.    ElectrifAi and the aforementioned Executive Committee members misinformed Plaintiff with the intention of deceiving her, and other employees, about the nature of the goods and services they were selling and in an effort to induce Plaintiff's employment.

211.    These statements about ElectrifAi's supposedly "artificial intelligence" and "machine learning" products were justifiably relied on by Plaintiff, who had a strong preference to work at companies selling "high-tech" goods and services, in deciding to work for ElectrifAi

212.    ElectrifAi's misrepresentations have not only harmed Plaintiff significantly, but also any of ElectrifAi's investors/owners and customers who were given the same false and fraudulent information.

213.    Plaintiff has also, subsequent to her termination from ElectrifAi, sought unemployment benefits and new employment.

214.    During the course of the appropriate unemployment agency's or prospective future employer's inquiries, the Corporate Defendants and/or Individual Defendants made

misrepresentations about Plaintiff which affected her ability to collect these benefits and/or to obtain subsequent employment.

215.    Said misrepresentations were material to determining Plaintiff's eligibility for unemployment and/or new employment.

216.    ElectrifAi and the Individual Defendants who made these representations did so knowing that their comments were actually relied upon by said unemployment authorities and prospective employers.

217.    All Defendants made their misrepresentative comments intending to mislead the unemployment authorities and prospective employers investigating the same.

218.    These statements about Plaintiff's employment or termination were justifiably relied on in determining Plaintiff's eligibility for unemployment benefits and future employment.

219.    The Individual Defendants are liable as the individuals who made these fraudulent representations to and/or about Plaintiff.

220.    The Corporate Defendants are liable as Plaintiff's former employer and/or via *respondeat superior* for any fault assigned to Individual Defendant employees that is deemed to be in the scope of their employment.

221.    As a result of Defendants' fraudulent acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage.

222.    Plaintiff is also entitled to punitive damages and other remedies as appropriate.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to

collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

## COUNT NINE
## DEFAMATION
## (ALL DEFENDANTS)

223.    Plaintiff repeats and realleges each paragraph above as if fully set forth herein.

224.    Plaintiff has, subsequent to her termination from ElectrifAi, sought unemployment benefits in New Mexico and Colorado as well as subsequent employment.

225.    During the course of the appropriate unemployment agency and prospective employers' inquiries, ElectrifAi, and several members of its Executive Committee, including ES, DC, LW, and SA, have made false statements regarding Plaintiff's employment at their company, the terms of her termination, or Plaintiff's qualifications for future employment.

226.    Said false statements were communicated to third persons and have harmed Plaintiff's reputation.

227.    Plaintiff is a very experienced executive salesperson who had high demand for employment prior to her tenure at ElectrifAi, but who has since had difficulties getting even interviews after her Employment therewith.

228.    ElectrifAi and the Executive Committee members who made these representations did so either with intention, knowing, reckless, or negligent disregard for the truth.

229.    The Individual Defendants are liable as the individuals who made these fraudulent representations about Plaintiff.

230.    The Corporate Defendants are liable as Plaintiff's former employer.

231.     As a result of Defendants' defamatory acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage, including damage to her professional reputation.

232.     Plaintiff is also entitled to punitive damages and other remedies as appropriate.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

**COUNT TEN**
**BREACH OF IMPLIED WARRANTY OF GOOD FAITH AND FAIR DEALING**
**(ALL DEFENDANTS)**

233.     Every party to a contract in New Jersey owes to all other parties thereto a duty of good faith and fair dealing to not do anything which would have the effect of destroying or inuring the right of the other party to receive the fruits of the contract.

234.     Plaintiff was contracted to work at ElectrifAi as an executive sales representative and was to be eligible for a commission in addition to her salary if certain performance standards were met.

235.     Plaintiff was prevented from performing the duties of her job and restricted from obtaining eligibility for commissions in light of the facts that (A) Plaintiff had her "position" changed three (3) times within her first three (3) weeks of employment, (B) was constantly refused specific information about the products she was selling, (C) was tasked with selling apparently nonfunctional or suboptimized products, (D) rarely had her advice implemented or seriously considered, (E) was excluded from projects that she was more qualified to assist with than others

assigned thereto, and (F) was otherwise given contradictory, fluctuating and/or restrictive instructions, all of which suggested she was never given a fair opportunity to contribute to the best of her abilities.

236. As such, the acts of the Individual and Corporate Defendants had the effect of destroying or inuring Plaintiff's continued employment and potential eligibility for a commission.

237. The Individual Defendants are liable as the individuals who acted in bad faith towards Plaintiff.

238. The Corporate Defendants are liable as Plaintiff's former employer and/or via *respondeat superior* for any fault assigned to Individual Defendant employees that is deemed to be in the scope of their employment.

239. As a result of Defendants' bad faith acts, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage, including damage to her professional reputation.

240. Plaintiff is also entitled to punitive damages and other remedies as appropriate.

**WHEREFORE**, Plaintiff demands judgment against Defendants for damages (compensatory, consequential, and punitive, including those related to Plaintiff's inability to collect unemployment or health insurance benefits), interest, attorney's fees, costs of suit, and other further relief as the Court deems just and appropriate.

**WILLIAMS, GRAFFEO & STERN, LLC**
*Attorneys for Plaintiff, Zonnia Lee*


*Brian Graffeo*

BRIAN P. GRAFFEO, ESQ.

Dated: September 13, 2023

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury for all issues so triable.

WILLIAMS, GRAFFEO & STERN, LLC
*Attorneys for Plaintiff, Zonnia Lee*

*Brian Graffeo*

Dated: September 13, 2023
BRIAN P. GRAFFEO, ESQ.

## DEMAND TO PRESERVE EVIDENCE

Defendants are hereby directed and demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's causes of action and/or prayers for relief, to any defenses to same, and pertaining to any party, including but not limited to, electronic data storage, closed circuit TV footage, digital images, computer images, cache memory, searchable data, emails, spreadsheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, twitter, Myspace, etc.) and any other information and/or data and/or documents which may be relevant to any claim or defense in this litigation. Failure to do so will result in separate claims for spoliation of evidence and/or for adverse inferences.

WILLIAMS, GRAFFEO & STERN, LLC
*Attorneys for Plaintiff, Zonnia Lee*

*Brian Graffeo*

Dated: September 13, 2023
BRIAN P. GRAFFEO, ESQ.